## STANOLIND OIL & GAS CO. v. HARVEY

(No. 2059; January 18, 1938; 75 Pac. (2d) 1)

For the plaintiff in error, the cause was submitted upon the brief of *Hagens & Wehrli* of Casper.

352

The cause was submitted for the defendant in error on the brief of *Fred W. Layman* of Casper.

354

KIMBALL, Justice.

Charles E. Harvey, a workman employed by Stanolind Oil and Gas Company, hereinafter called the "company," was awarded compensation for temporary total disability under the Workmen's Compensation Act, and the company by proceeding in error brings the case here for review.

The workman had been employed by the company as a roustabout since April, 1932. He was injured July 15, 1936, while assisting in laying a six-inch pipe for a water line. The facts in regard to the accident were not in dispute. A rope around a pipe broke while the workman was lifting on one end of a pick which had been thrust through the rope as a means of lifting the

pipe. When the rope broke the handle of the pick struck and injured the workman's testicles.

October 27, 1936, the workman filed his report of accident and his claim for compensation for temporary total disability from September 1, 1936, the day he was dropped from the company's pay roll. On November 14, 1936, the company filed its report of accident. These reports and the claim, required by Section 124-112, R. S. 1931, were on forms prepared by the state treasurer under Section 124-111. The statute (Sec. 124-112) requires that reports state "whether the injury has disabled the workman from continuing the performance of his duties," and the form for report of accident has a place for statement of when "disability began" and when "disability ceased." The workman's report stated that "disability began at once," and was "still continuing." In the company's report it was stated that the accident caused "injury to testicles," but the places for statements in regard to the disability were left blank.

The first page of the blank on which the company's report was made contains at the bottom this direction: "If the employer disputes the workman's claim he must set out in detail on the reverse side of this sheet his reasons therefor." The only reason given by the company for disputing the workman's claim was that the workman "has consistently refused to submit to medical treatment, and it is believed that if he had submitted to medical treatment, he would have entirely recovered very shortly after the date of the accident."

Section 124-113 provides that, if there be a dispute as to the right of the injured workman to receive compensation, or as to the amount thereof, there shall be a hearing "conducted on the statement and report filed by the employer, and such formal claims as may be presented and filed * * * on behalf of the injured workman." There is no provision for more formal pleadings.

At the beginning of the hearing, on April 13, 1937,

the attention of the court was called to the fact that the company's sole objection to the claim was on the ground that the workman had refused to submit to medical treatment, and the court then ruled that under the company's objection the burden of proof was on the company. This ruling was correct. Section 124-123 provides that "if any injured employee shall persist in unsanitary or injurious practice, which tends to imperil or retard his recovery, or if he shall refuse to submit to such medical or surgical treatment as is reasonably essential to promote his recovery, he shall forfeit all right to compensation under this chapter." The statute states a rule in regard to avoidable consequences. It was intended to prevent compensation for disability resulting from unreasonable conduct of the injured workman. We have held that the burden is on the employer to prove that the workman's recovery had been retarded by a persistence in injurious practices, the ground of forfeiture stated in the first clause of the statute. Kittleson v. Hibler, 37 Wyo. 332, 341, 261 Pac. 648. The rule in regard to the burden of proof is the same when the employer asserts that the workman has refused to submit to treatment reasonably essential to promote his recovery, the ground of forfeiture relied on in this case. See Gorral v. Hamlyn & Son, 38 R. I. 249, 94 Atl. 877; Gidley v. Industrial Com., 355 Ill. 586, 593, 189 N. E. 881, 884; Marshall v. Orient etc. Co., (1910) 1 K. B. 79, 3 B. W. C. C. 15.

At the hearing the company contended that the workman, by September 1, 1936, had recovered from the injury caused by the accident, and that any disability after that time was caused by gonorrheal infection, for which the workman refused to take treatment. We doubt that the question, whether the workman's disability was connected with the reported injury, was properly raised by the company's report of the accident. We need not discuss that point. The claim and

reports which in compensation cases take the place of pleadings should be liberally construed, and we do not think the workman was surprised at the hearing by evidence introduced for the purpose of showing that his disability was caused by gonorrhea and not by the accidental injury. It is fairly clear from the whole record that without objection the question of the cause of the workman's disability was tried as though it had been put in issue by the company's report. Of course, if the disability was not caused by gonorrhea, there was no ground for the contention that he should have taken treatment for that disease.

There was evidence tending to show that the workman had stated that he had gonorrhea in February, 1936. It was admitted that at that time and later the workman, without the advice of a physician, treated himself with a solution of neosilval, a medicine commonly used to cure gonorrhea. It was shown that the use of neosilval without a physician's advice by one afflicted with gonorrhea was likely to result in the germs being forced into the inner organs.

On the afternoon of July 15, 1936, the day of the accident, the workman was examined by Dr. Hart, a physician employed by the company, who then found no evidence of gonorrhea, but only swelling and tenderness which he attributed to the blow, and from which he expected the workman to recover in two or three weeks. The workman did not return to the hard work he was doing when he was injured, but was permitted to do light work until about September 1, 1936. During this time he continued under the care of Dr. Hart, who examined and treated him almost daily, but there was no improvement in the condition of the patient. In the meantime Dr. Hart, because the workman showed no response to treatment, decided there was something "that should require further investigation," and on August 22, 1936, took the workman to

Casper for examination by Dr. Reeve, employed by the company as a supervisory or consulting physician. At this examination the workman, according to the testimony of the doctors, "gave a history of gonorrheal infection" in the preceding February. On the basis of this history and of the workman's complaints of tenderness in the region of the epididymis and prostate, the doctors made a diagnosis of inflammation of the epididymis and prostate which they thought was caused by gonorrheal infection and could not have been caused by the injury in the accident. During the examination Dr. Reeve took a sample of the workman's blood to be tested in a laboratory. The only evidence in regard to the result of this test is the testimony of the workman that Dr. Hart told him that his blood showed "a two-plus gonorrhea." The diagnosis of gonorrhea by Dr. Reeve, concurred in by Dr. Hart, was made known to the workman on September 2, 1936. The company then announced that it would furnish treatment for that disease, but that the workman shouldn't expect compensation or wages during the treatment. The workman insisted that he did not have the disease and refused to take the treatment.

From the admissions of the workman, and other evidence showing that he had been treating himself with gonorrhea medicine in the preceding winter and spring, it was perhaps impossible to escape the conclusion that the workman then either thought he had the disease or knew he had been exposed to it. He testified that he used the medicine as a preventive. This may have been true, or, if he thought he had the disease, he may have been mistaken. He asserted that he had consulted another physician, Dr. Lenz, who told him he did not have gonorrhea.

The workman was examined by no less than six physicians who gave evidence in the case. None of them found the germ of gonorrhea. We have already noticed

the testimony of Dr. Hart and Dr. Reeve. Dr. Barrett, who treated the workman from December 31, 1936, until the date of the hearing, was a witness for the workman, and testified that he "tried many times and could never find any evidence of gonorrhea." Dr. Riach, a witness for the company, had examined the workman on March 5, 1937. He had not made a diagnosis of gonorrhea, but testified that, in view of the history of the case showing that the workman had treated himself for gonorrhea, he believed his condition (epididymitis, prostatitis, urethritis, cystitis, myositis, etc.) was caused by gonorrheal or genito-urinary infection. Dr. Weare, a specialist in urology and genito-urinary surgery, was a witness for the company. He had examined the workman on the day of the hearing, and found no evidence of gonorrhea or of inflammation of testicles, epididymis, or prostate.

The four physicians who were witnesses for the company expressed the opinion that the disability of the workman was not the result of the injury suffered on July 15, 1936. Dr. Barrett, the workman's physician, was of the opposite opinion. The question whether the blow may not have caused the disability by aggravating or accelerating a pre-existing disease (see Associated Seed Growers v. Scrogham (Wyo.) 73 P. (2d) 300), though suggested by some of counsel's questions, did not assume the importance of an issue at the hearing.

At the conclusion of the hearing, the judge was of opinion that "the evidence was not sufficient to determine whether or not the employee was entitled to compensation" and it was agreed that the workman should go to the Mayo Clinic, Rochester, Minn., for "a complete physical examination and determining if employee's present disability is the result of his injury suffered in July, 1936"; that a transcript of the evidence taken at the hearing should be sent to the Clinic for use in connection with such examination, and that

the written report of the examination should become a part of the evidence in the case. This agreement was carried out and the report of the Clinic, dated May 31, 1937, was in due course received by the court and offered and considered as part of the evidence in the case.

The report shows that the workman had been given a thorough examination. General physical examination was objectively negative. A number of special examinations were carried out which included examination of the prostate which showed no evidence of prostatitis or gonorrhea. Laboratory tests of urine and blood showed nothing of significance. The diagnoses were post-traumatic neurosis and lumbosacral strain. After considering the transcript of testimony which was submitted, together with the findings on examining the workman, the doctors gave the opinion that the ailment from which the workman was suffering "at the present time is post-traumatic neurosis" which "is probably an indirect result of the accident of July 15, 1936." It was stated that "it is possible for this condition to be cured by treatment which should consist of reassurance as to the absence of any serious organic disease, and a gradual resumption of work"; that the workman "should resume light work and gradually increase the amount of work done * * *, and at the end of one year, he should have recovered sufficiently so that he can do the work which he was able to do before the accident."

The court, on August 25, 1937, on consideration of the above report and the evidence taken at the hearing in April, found that the injury of July 15, 1936, had totally disabled the workman and caused traumatic neurosis. It was found that the disability continued until May 31, 1937, the date of the report of the Mayo Clinic. The order of award is for compensation for total, temporary disability, from September 1, 1936, to May 31, 1937.

It is evident that the court accepted the report of the

Mayo Clinic as resolving in favor of the workman the doubt in the mind of the court in April on the question whether the workman's disability was caused by the accidental injury or by gonorrheal infection. We cannot hold that the decision is not supported by substantial evidence. At least three physicians who had examined the workman failed to find any evidence of gonorrheal infection. With gonorrhea out of the case, the court was almost forced to the conclusion that the disability was caused by the reported injury, in accordance not only with the views of some of the doctors but also with the other evidence showing a condition of disability immediately following the injury and continuing with little change until the date of the hearing.

The company argues that the evidence, because it shows that the workman was able to do light work, was insufficient to establish total, temporary disability, defined by the statute as a condition which "temporarily incapacitates the injured person from performing any work at any gainful occupation for the time, but from which injury such person may recover by medical or surgical treatment and be able to resume work." Sec. 124-120 (c). This question was not raised by the company's report of accident, and in our opinion was not in the minds of the parties, witnesses or court as an issue at the hearing. Apparently the disability of the workman was taken for granted and evidence heard for the purpose of determining the cause. There is no reason to suspect that the company's failure to make an issue on the question of disability was the result of collusion between the parties or of indifference on the part of the company. In the circumstances, we should not feel justified in disturbing the award for lack of evidence as to the extent of the workman's disability unless we could say that the evidence showed affirmatively that the workman was not totally disabled

during the period for which compensation was allowed. That is not the case.

Although, as we have said, the workman's disability seems to have been taken for granted at the hearing, there was much testimony, coming more or less casually from witnesses on both sides, tending to show total disability. After the injury until September, 1936, the workman was permitted by the company to do light work. The workman said he "just monkeyed around." The only tasks particularly described were the hoeing of weeds and the washing of grease from a motor. No one testified that he worked or was able to work after September 1 when it seems that his condition was worse than it was when he began taking treatments. He testified that on September 1st Dr. Hart said "I wasn't getting along as good as I should and he was going to take me off work." Thereafter he was examined or treated by three physicians besides those who were witnesses. On December 31, he was put in a hospital where he was kept throughout the whole of January, 1937. The company's Personnel Supervisor testified that the workman, on September 12, 1936, "looked" worse than he did in July, about the same as he did at the hearing, and that he "did not look like he was able to work." The company's District Superintendent testified that, in October, 1936, he advised the workman to "do something about his physical condition." The company's Pipe Line Foreman, who saw the workman April 3, 1937, and at two or three times after his injury testified: "I thought he was in bad shape and should have something done." Dr. Hart testified that if the workman had taken treatment for gonorrhea "he would have been restored to his normal ability to work." Dr. Weare testified: "I grant that this man is sick," and when asked whether it was possible by properly treating the workman to improve his condition so that he could return to work, replied:

"Yes. Further examination would be necessary, however." Dr. Barrett testified that the condition of the workman had improved since December, 1936, but that he was not able to go to work at the time of trial. The workman himself testified that he didn't feel able to work. There was no evidence indicating that he was malingering. He probably not only felt unable to work, but had grounds for believing that work might retard recovery. It was not until the examination at the Mayo Clinic that he was assured of the absence of organic trouble and advised to do light work. We think the evidence in regard to his disability was sufficient to justify the court in finding that total disability continued until the report based on that examination. See Baldwin v. Scullion, 50 Wyo. 508, 532, 62 P. (2d) 531, 539.

The order of award will be affirmed.

BLUME, Ch. J., and RINER, J., concur.